Kaitlyn D. Shannon (SBN 296735)
BEVERIDGE & DIAMOND, P.C
456 Montgomery Street, Suite 1800
San Francisco, California 94104-1251
Phone: (415) 262-4000
kshannon@bdlaw.com

Bryan J. Moore (*pro hac vice*)
BEVERIDGE & DIAMOND, P.C.
400 West 15th Street, Suite 1410
Austin, Texas 78701-1648
Phone: (512) 391-8030
bmoore@bdlaw.com

Attorneys for Plaintiff
3M Company

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3M COMPANY,<br><br>*Plaintiff*,<br><br>v.<br><br>G7 ENVIRONMENT, LLC, AURIE GALVEZ, THOMAS FORBES, AND KEVIN ALLYN,<br><br>*Defendants*. | **CASE NO. 2:20-CV-08892-PA-AFM**<br><br>**FIRST AMENDED COMPLAINT FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, TRADEMARK DILUTION, AND FALSE ADVERTISING**<br><br>**DEMAND FOR JURY TRIAL** |

Based on its knowledge, and on information and belief as to all other matters, Plaintiff 3M Company ("3M") alleges as follows against G7 Environment, LLC, Aurie Galvez, Thomas Forbes, and Kevin Allyn (collectively, "Defendants"):

## I.   INTRODUCTION

1.   This lawsuit is brought to further 3M's efforts to combat the fraudulent exploitation of the surge in demand for 3M-brand personal protective equipment

("PPE") during the pandemic. This fraud diverts legitimate efforts to secure genuine PPE to protect front-line workers, including healthcare workers, first responders, and critical infrastructure operators.  In its efforts to profiteer from the pandemic, Defendants have repeatedly made intentionally false and misleading claims to be a bulk buyer and distributor of respirators from 3M; to have purchased, to have a prospective transaction to purchase, or to otherwise have the ability to purchase billions of respirators from 3M; and that 3M has a "mutual interest" in supplying Defendants with up to 10 billion respirators and is among G7 Environment's "Partners In The Fight" to combat COVID-19.  All these statements are lies to perpetuate Defendants' false and deceptive ploy to defraud unwitting customers seeking essential PPE to safeguard their health and the health of others during the COVID-19 pandemic.  3M is suing to end the fraud, to protect the brave frontline workers in the fight against COVID-19, to end Defendants' ongoing attempts to falsely claim an affiliation with 3M, and to end Defendants' unauthorized use of 3M's name and famous trademarks.

2.      Defendants operated and continue to operate an illegal scheme to defraud individuals, businesses, and institutions by conning them into transferring significant sums of money to Defendants for substantial purported quantities of 3M-brand respirators that Defendants cannot and could never obtain or deliver. Defendants promised to deliver quantities far exceeding 3M's entire annual production of respirators.  Defendants have no business relationship with 3M and do not have the ability to fulfill the orders for 3M-brand respirators that Defendants receive and for which Defendants are paid, or solicit payment, in advance.

3.      While Defendants' scheme is conceptually simple, its execution can have devastating impacts.  Defendants target healthcare workers, first responders, critical infrastructure operators, and consumers seeking essential PPE to safeguard their health and the health of others during the pandemic.  Defendants fabricate documents and other materials to con prospective purchasers into believing that

Defendants have access to billions of 3M-brand respirators. Defendants solicit advance payment for substantial purported quantities of 3M-brand respirators that Defendants cannot obtain or deliver, or can only obtain and deliver from illicit sources in substantially lower quantities and at significantly higher prices than the published list prices for which 3M sells its respirators. Defendants are unlawfully enriched while their "customers" are still lacking the critical PPE that they so desperately need. And, having been defrauded, Defendants' "customers" are now in even more dire straits – they now have less funds to purchase their needed respirators from legitimate sources and they have wasted precious time seeking nonexistent PPE from Defendants.

4.      Defendants falsely associate 3M and its reputation and goodwill with Defendants' fraudulent scheme – purportedly as a "partner" with "mutual interests" aligned with Defendants. Defendants falsely advertised for sale, and continue to advertise, respirators with 3M's famous trademarks, trading on 3M's brand and reputation for products that consumers around the world trust for their superior quality and reliability. Defendants further engaged in price-gouging and other unfair and fraudulent sales techniques in order to take advantage of vulnerable consumers desperately in need of this critical PPE.

5.      Defendants have repeatedly claimed false affiliations with 3M that violate not only 3M's rights under the Lanham Act, but also criminal law, and Defendants' behavior continues to persist. Defendant G7 Environment, LLC, maintains a website where it purports to list its "Partners In The Fight" to combat COVID-19 and displays there on its webpage the 3M logo among the logos of other purported "partners." *See* G7 Environment, About Us, *available at* https://www.g7environment.com/pages/about-us. 3M has no affiliation with Defendants – no partnership of any kind – and has not authorized Defendants to use or display the 3M logo.

6.      Defendants not only claim false affiliations with 3M, but have also

fabricated and distributed a "Letter of Intent" that purports "to provide a written expression of the mutual interest" of Defendants and 3M to transfer up to 10 billion 3M N95 1860 respirators from 3M to Defendants at a price of $2.53 per respirator. There is no such intent; no such "mutual interest."  3M has never expressed any interest in selling or intent to sell its respirators to Defendants, and 3M cannot – even in theory – supply Defendants or any prospective buyer with respirators in such quantities.  As noted below, 3M has dramatically increased its production of respirators such that, by the end of 2020, it will be producing respirators at a rate of 2 billion annually (roughly tripling 2019's total).  Thus, Defendants either claim to have access to more 3M respirators than 3M has ever produced in a given year, or claim to have sole access to the next 5 years of 3M production.  Obviously, Defendants' claims are wholly fictitious.

7.     Defendants are not authorized 3M distributors or resellers and are not an authorized channel for the placement of an order for 3M-brand respirators. Defendants do not have access to any 3M-brand respirators directly from 3M, much less 10 billion, and there is no authorized 3M distributor that can supply Defendants with anywhere near the quantity of respirators that Defendants claim to be able to access.

8.     As 3M has stated from the outset of the COVID-19 pandemic, it has not and will not raise its respirator prices as a result of the pandemic, and 3M has published the single-case list prices for the most common 3M-brand N95 respirators so that purchasers can identify and avoid inflated prices.  The 3M-published list price for a 3M N95 1860 respirator is $1.27 per respirator.  Defendants' fabricated "Letter of Intent," however, states that they would be purchasing billions of 3M-brand 1860 respirators from 3M for $2.53 per respirator (i.e., twice 3M's published list price), in an obvious attempt to hide and justify Defendants' price-gouging. Defendants use their fabricated "Letter of Intent" to con individuals, businesses, and institutions into giving Defendants substantial sums of money for grossly over-

priced respirators in quantities that Defendants cannot obtain and deliver.  It is a simple fraud scheme perpetuated on a grand scale with devastating impacts.  And to associate 3M and its valuable name and marks with such fraud, price-gouging, and despicable conduct just adds to Defendants' unlawful misconduct.

9.    3M has never had any affiliation whatsoever with Defendants, whose fraudulent ploy during a global pandemic represents not only a new low in predatory profiteering, but also endangers lives and wastes precious time and resources – financial and otherwise – by diverting buyers from legitimate sources of much-needed respirators.

10.    3M filed this suit to shut down Defendants' unlawful activity, protect the public from Defendants' ongoing fraud, and protect 3M's name, reputation, and trademarks from being associated with Defendants' unlawful and unethical efforts to profiteer from the pandemic.

11.    3M respectfully requests that this Court preliminarily and permanently order Defendants to cease using 3M's name and trademarks; to cease falsely claiming to be affiliated or associated with 3M in any capacity; and to cease making false representations concerning 3M.  3M also seeks damages and other relief to remedy and deter Defendants and other would-be fraudsters, and any monetary recovery in this case will be donated by 3M to charitable COVID-19 relief efforts.

12.    In addition to the damages and injunctive relief sought in this complaint, 3M intends to refer this matter to law enforcement.

## II.    BACKGROUND

13.    Throughout its history, 3M has provided state-of-the-art, industry-leading scientific and medical products to consumers throughout the world under its famous 3M name and trademarks.  Based on this longstanding, continuous use, consumers associate the 3M trademarks uniquely with 3M.  Now, more than ever, consumers are also relying on the famous 3M name and trademarks to indicate that the products offered thereunder are of the same superior quality that consumers

have come to expect over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and PPE, including 3M-brand N95 respirators.

14.     Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle, 3M is working around the clock to supply healthcare workers, first responders, and critical infrastructure operators with millions of 3M-brand respirators.  Beginning in January 2020, 3M began increasing its production of 3M-brand respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month.  3M is also investing capital and resources to enable it to double its respirator production capacity again, to an annual production rate of 2 billion globally before the end of 2020.  In the United States alone, 3M produced 50 million respirators in the month of August, and expects to increase the production rate to 95 million per month by October.  To supplement its U.S. production, 3M has imported more than 222 million 3M-brand respirators from 3M's production facilities overseas.  In the United States, the majority of 3M's respirators are going to healthcare and public-health users, with the remaining supply deployed to other critical industries, such as energy, food, and pharmaceuticals.  The U.S. distribution of 3M-brand respirators is being coordinated with the Federal Emergency Management Agency, which is basing allocation decisions on the most urgent needs.

15.     The demand for 3M-brand respirators has grown exponentially in response to the pandemic.  3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to the places where they are needed most.  Importantly, 3M has ***not*** increased and will not increase the prices it charges for 3M-brand respirators as a result of the COVID-19 pandemic.

16.     In the midst of these efforts by 3M and the global health community to respond to the pandemic, certain bad actors have sought to exploit the crisis and

prey on innocent parties through a variety of ploys involving 3M-brand N95 respirators, other PPE, and other health-related products in high demand.  These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices – all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

17.     3M is taking an active role to combat the fraudulent activity, price-gouging, and counterfeiting related to 3M-brand N95 respirators that has spiked in the marketplace during the pandemic.  3M's actions include working with law enforcement authorities around the world, including the U.S. Department of Justice, state Attorneys General, the Federal Bureau of Investigation, the U.S. Attorney General, state attorneys general, and local authorities to combat price-gouging, counterfeiting, and other unlawful activities.  3M has established a dedicated point of contact for federal and state procurement officials to promptly validate third-party offers and quotes.  In doing so, 3M has already helped prevent dozens of potentially fraudulent transactions with federal agencies, state governments, municipal governments, private enterprises, and other organizations.  Every U.S. governor has been briefed on 3M's efforts, and 3M is in regular contact with numerous governors and state attorneys general regarding these efforts to prevent and combat fraud.  The Department of Justice has publicly thanked 3M for the assistance it has provided in investigations that have led to arrests.  *See* U.S. Dep't of Justice, U.S. Attorney's Office, Southern District of New York, *New Jersey Man Arrested For $45 Million Scheme To Defraud And Price Gouge New York City During COVID-19 Pandemic*, *available at* https://www.justice.gov/usao-sdny/pr/new-jersey-man-arrested-45-million-scheme-defraud-and-price-gouge-new-york-city-during (updated May 26, 2020).

18.     3M has also created a website where people can report potential price-gouging, and a "3M COVID-19 Fraud Hotline" where users and purchasers of 3M products can call or email for information and to help detect fraud and avoid

counterfeit products.  3M is also publishing information about its anti-price-gouging and counterfeiting efforts on the 3M website, including disclosure of 3M's list prices for its most common models of N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to identify 3M authorized distributors and dealers in the United States and Canada.  Further information about 3M's efforts are set forth in the 3M press release and publication attached hereto as **Exhibits 1 and 2**.

19.    A key component of 3M's efforts to combat fraud, price-gouging, and counterfeiting has been the removal of bad actors through policing their activity on the internet.  3M has successfully secured the removal of more than 9,000 sales offers with fraudulent or counterfeit product offerings from online marketplaces around the world, more than 12,000 false or deceptive social media posts, and more than 200 deceptive internet addresses.

20.    Including this action, 3M has filed 19 lawsuits in federal courts across the country in its fight against fraud, price-gouging, and counterfeiting.  3M has obtained nine temporary restraining orders and six preliminary injunction orders that put a stop to other defendants' unlawful and unethical profiteering from the pandemic.  And 3M has favorably resolved 11 other matters, ensuring that the defendants' misconduct stopped immediately and permanently.

21.    Despite these extensive efforts during the COVID-19 crisis, pandemic profiteers continue to prey on and deceive consumers, including front-line healthcare workers and first responders, trading on the fame of the 3M names and trademarks, and falsely associating themselves with 3M and its reputation for providing the highest quality PPE at fair prices.  Defendants' scheme to illegally enrich themselves during the current global health crisis exemplifies pandemic profiteering.

22.    3M does not – and will not – condone bad actors deceptively trading on the fame and goodwill of the 3M brand and trademarks for their personal gain.

3M is committed to working to address and prevent the exploitation of the surge in demand for 3M-brand products during this historic health crisis.

23.     Accordingly, to protect the public from Defendants' fraud and profiteering; to prevent healthcare providers and procurement officers from wasting their valuable time and resources on illegitimate, fraudulent offers for critical health supplies; and to stop Defendants' ongoing and future infringement, tarnishment, and dilution of 3M's name, trademarks, reputation, fame, and goodwill, 3M brings this lawsuit against Defendants for trademark infringement; unfair competition; false association; false endorsement; false designation of origin; trademark dilution; false advertising; and unlawful, unfair, and fraudulent business acts and practices. Defendants have shown a propensity to form or engage multiple front entities to conceal and perpetuate their unlawful activities, and they may be seeking to continue and further their illegal acts through such entities unless and until they are enjoined by this Court.

24.     3M seeks an award of monetary damages (trebled), attorneys' fees and costs, the disgorgement of Defendants' illicit profits, prejudgment interest, and injunctive relief preventing Defendants from future unlawful acts against 3M's rights.  Any and all monetary awards received by 3M will be donated to charitable COVID-19 relief efforts.

## III.   THE PARTIES

25.     Plaintiff 3M is a Delaware corporation, with a principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.  3M is a diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

26.     On information and belief, Defendant G7 Environment, LLC ("G7 Environment"), is a limited liability company organized pursuant to the laws of the State of Delaware, with a principal place of business in the City of Garden Grove,

County of Los Angeles, California.

27.     On information and belief, Defendant Aurie Galvez ("Galvez") is an individual residing in the State of California and is the Chief Executive Officer and a member of G7 Environment.

28.     On information and belief, Defendant Thomas Forbes ("Forbes") is an individual residing in the State of California and is the Chief Operations Officer and a member of G7 Environment.

29.     On information and belief, Defendant Kevin Allyn ("Allyn") is an individual residing in the State of California who has represented that he is affiliated with Green Net, Inc. (a/k/a Green Net Corp.), and that Green Net, Inc. is a buyer of 3M N95 respirators acting on behalf of G7 Environment.

### IV.     JURISDICTION AND VENUE

30.     3M's claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, as asserted in Claims 1 through 4 below arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), 15 U.S.C. §§ 1051, *et seq.*  Accordingly, this Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §§ 1331, 1338(a) & (b), and 15 U.S.C § 1121(a).

31.     3M's claims for false advertising in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, false advertising in violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, and common law unfair competition are so related to the federal claims asserted in Claims 1 through 4 below that they form part of the same case or controversy.  Accordingly, this Court has supplemental jurisdiction over Claims 5 through 7 pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

32.     This Court has personal jurisdiction over Defendant G7 Environment because its principal place of business is in the City of Garden Grove, County of Los Angeles, California, within the Central District of California, and otherwise

does business there.  This Court has personal jurisdiction over Defendants Galvez, Forbes, and Allyn because they are individuals who reside in and/or regularly transact business in the State of California.  3M's claims against Defendants arise out of the committing, or facilitating the commission of, tortious acts in California.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in the Central District of California and also because Defendants are subject to personal jurisdiction in this District.

## V.     FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Plaintiff 3M

34.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  Today, 3M offers over 60,000 products, ranging from household and school supplies, to industrial and manufacturing materials, to critical medical supplies and protective equipment.

### B.     The 3M Brand

35.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more.  Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

36.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many more.  As a result, 3M-brand products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and

integrity associated with the 3M brand.

**C.   The Famous "3M" Respirators**

37.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirators) under the standard-character mark "3M" and the 3M logo shown below (together, the "3M Marks"):



38.     For decades, products offered under the 3M Marks have enjoyed enormous commercial success including, without limitation, 3M-brand N95 respirators.  Indeed, in 2019 alone, sales of products offered by 3M exceeded billions of dollars, with the vast bulk of such products sold under and in connection with the 3M Marks.

39.     Over the same period of time, products offered under the 3M Marks regularly have been the subject of widespread, unsolicited media coverage and critical acclaim.

40.     Based on the foregoing, consumers associate the 3M Marks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Marks.  Based on the foregoing, the 3M Marks have also become famous among consumers, not only in California, but throughout the United States.

41.     To strengthen 3M's common-law rights in and to its famous 3M Marks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M mark in International Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"), (ii) U.S. Trademark Reg. No. 2,692,036,

which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in International Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"). True and correct copies of registration certificates for these registrations are attached hereto as **Exhibit 3**.

42.     Each of these Registrations is valid, in effect, and on the Principal Register.

43.     Each of these Registrations is "incontestable" within the meaning of 15 U.S.C. § 1065. Accordingly, each Registration constitutes conclusive evidence of: (i) 3M's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity of the registration of the 3M Marks; and (iv) 3M's exclusive right to use the 3M Marks throughout the United States for, *inter alia*, respirators.

44.     3M's famous 3M Marks do more than identify 3M as the exclusive source of goods and services offered thereunder. The famous 3M Marks also signify to consumers that 3M-brand products offered under the 3M Marks are of the highest quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M Marks' ability to signify that products offered under the 3M Marks are of the same high quality that consumers have come to expect of the 3M brand over the past century.

**D.     3M's Extensive Efforts to Assist In the Battle Against COVID-19**

45.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19. As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":



46.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are its 3M-brand N95 respirators.

47.     Authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

48.     Based on the exponential increase in demand for 3M-branded respirators, 3M has invested in the necessary capital and resources to double its annual production of 1.1 billion respirators.  *See* **Exhibits 1, 2**.  What 3M has ***not*** done in the face of the global COVID-19 pandemic is increase its prices.  *See id.*

49.     Unfortunately, 3M's sense of civic responsibility during this time of crisis is not universally shared and bad actors are seeking to exploit the increased demand for 3M-brand N95 respirators.  Bad actors, like Defendants, advertise 3M-brand N95 respirators without any intention to supply product at all, or certainly not at the proposed levels.  Other opportunists advertise and sell counterfeit, damaged, deficient, or otherwise altered versions of 3M's genuine N95 respirators to consumers seeking to protect their health.

50.     To protect both consumers and healthcare workers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand, 3M is working

diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators.  For example, in late March 2020, 3M's Chief Executive Offer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging.  As shown in the inset image below, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

   a.  3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify inflated pricing (*See* **Exhibit 4**);

   b.  3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*See* **Exhibit 5**); and

   c.  3M created a fraud "hotline" that consumers can call to report suspect incidents of price-gouging and counterfeiting.

   d. 3M created a regularly updated website (at 3M.com/covidfraud) with all of these materials and more readily available.



   **E.     Defendants' Unlawful Conduct**

   51.     Despite 3M's extensive measures to combat fraudulent schemes to exploit the increased demand for 3M-brand N95 respirators, bad actors continue to prey upon vulnerable consumers.  Defendants are prime examples of this unlawful

behavior, which jeopardizes public health and safety and risks damaging 3M's brands and reputation.

52.     While the full extent of Defendants' fraudulent schemes involving 3M products is currently unknown and will be explored in discovery, 3M is in possession of certain of Defendants' fabricated marketing materials, and Defendant G7 Environment's website marketing 3M-brand respirators and claiming a nonexistent partnership with 3M remains online.  *See* G7 Environment, About Us, *available at* https://www.g7environment.com/.

53.     One of Defendants' fabricated marketing materials is a purported "Letter of Intent" dated July, 23, 2020, signed by Defendant Allyn.  This wholly fictitious "Letter of Intent" purports "to provide a written expression of the mutual interest" of Defendant G7 Environment and 3M to transfer up to 10 billion 3M N95 1860 respirators from 3M to Defendants at a price of $2.53 per respirator.  There is no such intent; no such "mutual interest."  3M has never expressed any interest in selling or intent to sell its respirators to Defendants, and 3M cannot – even in theory – supply Defendants or any prospective buyer with respirators in such quantities.  As discussed above, 3M has dramatically increased its production of respirators such that, by the end of 2020, it will be producing 2 billion respirators annually.  Thus, Defendants claim to have sole access to the next 5 years of production.  Obviously, Defendants' claims are lies.

54.     Defendants are not authorized 3M distributors or resellers and are not an authorized channel for the placement of an order for 3M-brand respirators.  Defendants do not have access to any 3M-brand respirators directly from 3M, much less 10 billion, and there is no authorized 3M distributor that can supply Defendants with anywhere near the quantity of respirators that Defendants claim to be able to access.  Again, these are all lies from the Defendants.

55.     As noted above, 3M has stated from the outset of the COVID-19 pandemic that it has not and will not raise its product prices as a result of the

pandemic, and has published the single-case list prices for the most common respirators.  3M has published its suggested list price to end customers, and a 3M N95 1860 respirator's list price is $1.27 per respirator.  Defendants' false representation in their fabricated "Letter of Intent" that they would be purchasing billions of 1860 respirators from 3M for $2.53 per respirator (i.e., twice 3M's published list price) is an obvious attempt to hide and justify Defendants' intended price-gouging.  Defendants use their fabricated "Letter of Intent" to con individuals, businesses, and institutions into giving Defendants substantial sums of money for grossly over-priced respirators in quantities that Defendants cannot obtain and deliver.

56.     Another of Defendants' fabricated marketing materials is a July 27, 2020 letter on the letterhead of the "Law Offices of Jerome A. Clay" and bearing the signature of Mr. Clay, an attorney licensed in the State of California with an office in Stockton, California.  Mr. Clay has represented to 3M that his signature on this letter was forged, and that the letter was fabricated and dated over a month after counsel for Mr. Clay issued a cease and desist letter to Defendants Galvez and Forbes directing them "not to manufacture, use, or distribute anything with Mr. Clay's name, bar number, signature, or likeness on it ever again—ever."  The fabricated July 27 letter is addressed to "3M Global" (with no mailing address or contact name) and asserts that "Green Net Corp" is "represented by Mr. Aurie Galvez" and "is willing and able" to purchase 10 billion 3M N95 1860 respirators.  The letter provides Defendant Forbes' G7 Environment email address as a point of contact and shows Defendant Galvez as being copied on the letter.  3M has no record of ever having received this July 27 letter and expects the evidence to show that no attempt was ever made by Defendants to send it to 3M.  Rather, 3M expects the evidence to show that, like Defendants' fabricated "Letter of Intent," this July 27 letter was among Defendants' fictitious marketing materials that Defendants distributed to prospective customers to give a false semblance of legitimacy to their

fraudulent scheme.

57.    Defendant G7 Environment maintains a website where it purports to list its "Partners In The Fight" to combat COVID-19 and displays there on its webpage the 3M logo among the logos of other purported "partners." *See* G7 Environment, About Us, *available at* https://www.g7environment.com/pages/about-us.   3M has no affiliation with Defendants – no partnership of any kind – and has not authorized Defendants to use or display the 3M logo.

58.    Defendant G7 Environment also advertises 3M N95 1860 respirators for sale on its website, replete with an image of an 1860 respirator bearing the 3M logo. *See* G7 Environment, Products, 3M N95 Structured Face Mask, *available at* https://www.g7environment.com/products/n95-structured-face-mask-3m. Defendant G7 Environment is not an authorized distributor of 3M-brand N95 respirators; its listing of 3M-brand N95 respirators on its website for sale is intended to defraud, mislead, and/or deceive a reasonable consumer into believing that Defendants are authorized distributors of 3M's products and/or have an association or affiliation with 3M.

59.    While the foregoing examples of Defendants' unlawful conduct are very likely just the tip of the iceberg in terms of the full scope of Defendants' fraudulent schemes involving 3M products, this unlawful conduct has caused irreparable damage to 3M's reputation and its famous 3M Marks.  There is no adequate remedy at law for these injuries.

60.    Based on the foregoing, 3M seeks relief against Defendants for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and unlawful, unfair, and fraudulent business acts and practices.

# VI.  CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### Trademark Infringement – 15 U.S.C. § 1114(1)

63.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

64.    3M is the exclusive owner of each of the federally registered 3M Marks identified herein.

65.    3M's exclusive rights in and to each of the 3M Marks predate any rights that Defendants could establish in and to any mark that consists of "3M" in whole and/or in part.

66.    The 3M Marks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

67.    The 3M Marks have acquired distinctiveness and identify 3M as the exclusive source of products offered under the 3M Marks including, without limitation, 3M-brand N95 respirators.

68.    Defendants are using the 3M Marks in commerce on to advertise, promote, offer for sale, and sell 3M-brand N95 respirators, including, for example, in communications to companies providing PPE to healthcare providers and front-line workers and on Defendant G7 Environment's publicly-available website.

69.    Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants are affiliated with 3M, including, without limitation, whether Defendants are licensees, authorized distributors, and/or affiliates of 3M, and/or about products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

70.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants' products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

71.     Defendants' use of the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants and/or Defendants' products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M.

72.     3M has not consented to the use of its famous 3M Marks by Defendants.

73.     Based on 3M's longstanding and continuous use of its 3M Marks in United States commerce, as well as the federal registration of the 3M Marks, Defendants had actual and constructive knowledge of 3M's superior rights in and to the 3M Marks when Defendants began using the 3M Marks as part of their bad-faith ploy to confuse and deceive consumers, as alleged herein.

74.     Upon information and belief, Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

75.     Upon information and belief, Defendants have made, and will continue to make, substantial profits and gain from their unauthorized use of the 3M Marks, to which Defendants are not entitled at law or in equity.

76.    Upon information and belief, Defendants' acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114(1).

77.    3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their unlawful scheme and misrepresentations about 3M-brand respirators during a global pandemic when such respirators are essential to safeguard the public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

78.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## SECOND CLAIM FOR RELIEF

### Unfair Competition, False Endorsement, False Association, and False Designation of Origin – 15 U.S.C. § 1125(a)(1)(A)

79.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

80.    Upon information and belief, Defendants' acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

81.    Upon information and belief, Defendants' use of 3M's famous 3M Marks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

82.     Defendants also falsely represented themselves as affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Marks, including, without limitation, 3M-brand respirators.  Defendants sought to create the false impression that the products they purported to offer to customers and others originate from, and/or are sponsored or approved by, and/or offered under a license from, 3M.

83.     Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith actions of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks, including, without limitation, 3M-brand N95 respirators.

84.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

85.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## THIRD CLAIM FOR RELIEF
### Trademark Dilution – 15 U.S.C. § 1125(c)

86.     3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

87.     The 3M Marks are famous and have been famous at all times relevant to this action.  The 3M Marks were famous before and at the time Defendants began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators).

88.     Defendants' misuse of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to

dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' established selling power and value will be whittled away.

89.     Defendants' misuse of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the famous 3M Marks, such that the famous 3M Marks' ability to identify 3M as the exclusive source of products offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) will be whittled away.

90.     Defendants' misuse of 3M's famous 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, is likely to dilute the reputation of the famous 3M Marks, such that the famous 3M Marks' established ability to indicate the superior quality of products offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators) will be whittled away.

91.     Defendants' misconduct also threatens to harm the reputation of the 3M Marks, constituting dilution by tarnishment of the famous 3M Marks.

92.     Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

93.     Defendants adopted and used the 3M Marks in furtherance of Defendants' willful, deliberate, and bad-faith actions of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Marks (including, without limitation, 3M-brand N95 respirators).

94.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The

damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their illegal scheme and making misrepresentations about 3M-brand respirators during a global pandemic when those products are essential to safeguard the public health.  Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators.  Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

95.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

### FOURTH CLAIM FOR RELIEF
### False Advertising – 15 U.S.C. § 1125(a) et seq.

96.    3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

97.    The statements that Defendants made to the public and unwitting consumers contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendants and/or the products that Defendants allegedly had and/or have available for sale and constitute commercial advertising and/or commercial promotion.

98.    Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

99.    Defendants' willful and deliberate use of false, misleading, and/or deceptive statements trades upon the extensive consumer goodwill, reputation, fame, and commercial success of 3M products, including, without limitation, 3M-brand N95 respirators.

100.   3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by 3M is exacerbated by the fact that Defendants are making misrepresentations about 3M-brand respirators during a global pandemic when those products are essential to safeguard the public health. Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators.  Whereas 3M's corporate values and  brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

101.   3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## FIFTH CLAIM FOR RELIEF

**False Advertising in Violation of California Unfair Competition Law – Business & Professions Code, § 17200 *et seq.***

102.   3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

103.   Defendants' unauthorized use in commerce of the 3M Marks is also likely to cause consumer confusion or mistake or to deceive consumers into believing that Defendants' products and/or services are sponsored by, endorsed by, or originate from 3M or are otherwise connected or affiliated with or approved by 3M, thereby causing loss, damage, and injury to 3M and to the purchasing public, constituting unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200, *et seq.*

104.   Defendants' marketing and advertisement of products with the 3M Marks, as alleged herein, was intended to and did mislead 3M's customers and consumers to believe that such products were distributed by, or authorized for

distribution by, 3M, in violation of California Business & Professions Code § 17200, *et seq*.

105.   This conduct, together with Defendants' other acts alleged herein, constitute unfair, unlawful, and fraudulent business acts and practices under California Business & Professions Code § 17200, *et seq.*, because such acts are forbidden by various state and federal laws and are unscrupulous, unfair, and injurious to 3M.  Defendants' acts have irreparably damaged 3M and the consuming public and will continue to do so unless restrained by this Court, and 3M is without an adequate remedy at law.

106.   As a result of Defendants' wrongful conduct, 3M is entitled to, among other relief, an order enjoining and restraining Defendants from diverting, distributing, and selling the 3M-brand products, and 3M is entitled to restoration of any funds that were wrongfully collected by Defendants so that those funds may be donated to charitable COVID-19 relief efforts of 3M's choosing.  3M requests the relief set forth in the Prayer for Relief below.

## SIXTH CLAIM FOR RELIEF

### False Advertising – Business & Professions Code, § 17500 *et seq.*

107.   3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

108.   As alleged herein, Defendants have engaged in violations of California Business & Professions Code § 17500, *et seq*., by making or disseminating untrue or misleading statements, with the intent to induce the purchase of 3M-brand N95 respirators.  Defendants represented that Defendants were agents of and/or authorized by 3M to sell and/or distribute 3M-brand products when Defendants knew or by the exercise of reasonable care should have known the statements were untrue, misleading, and likely to deceive the reasonable consumer and the public.

109.   Defendants engaged in the false and/or misleading advertising and marketing of the 3M-brand N95 respirators, as alleged herein, with the intent to directly or indirectly induce consumers to purchase those respirators.

110.   Had Defendants truthfully advertised that they were not authorized to sell 3M-brand products, consumers would not have purchased the products or would have purchased such or similar products from another manufacturer or distributor.

111.   On information and belief, as a direct and proximate result of the aforementioned acts and omissions by Defendants, Defendants received and continue to hold monies rightfully belonging to 3M and that 3M will donate to charitable COVID-19 relief efforts.

112.   3M requests the relief set forth in the Prayer below.

### SEVENTH CLAIM FOR RELIEF
### Common Law Unfair Competition

113.   3M repeats and incorporates by reference the statements and allegations in the preceding paragraphs of the Complaint as though set forth fully herein.

114.   Defendants' acts and conduct complained of herein constitute unfair competition in violation of California common law.

115.   3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

116.   3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

### PRAYER FOR RELIEF

**WHEREFORE**, based on Defendants' conduct complained of herein, 3M asks this Court:

117.   To enter an Order, finding in 3M's favor on each Claim for Relief asserted herein;

118.   For Claims 1 through 4 under the Lanham Act for federal trademark infringement, unfair competition, false endorsement, false association, and false designation of origin, trademark dilution, and false advertising:

(A): Pursuant to 15 U.S.C. § 1116:

      (i)    To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers, and all persons and entities in active concert and participation with them from misusing the 3M Marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M-brand N95 respirators, including but not limited to (A) using the 3M Marks in a way that misrepresents Defendants' relationship with 3M or 3M's relationship with the products being offered by Defendants; and (B) using the 3M Marks in way which dilutes their distinctive quality or tarnishes 3M's reputation;

      (ii)   To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers, and all persons and entities in active concert and participation with them from falsely representing themselves as being authorized distributors, authorized suppliers, authorized sellers, authorized retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirators) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M

and/or any of 3M's products and/or 3M's officers or employees;

(iii) To order Defendants to file with the Court and serve upon 3M's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(B): Pursuant to 15 U.S.C. § 1117:

(i) To order Defendants to provide 3M with a full accounting of all manufacture, distribution, and sale of products under the 3M Marks (including, without limitation, 3M-brand N95 respirators), as well as all profits derived therefrom;

(ii) To order Defendants to pay to 3M – for donation to charitable COVID-19 relief efforts – all of Defendants' profits derived from the sale of infringing goods offered under the 3M Marks (including, without limitation, 3M-brand N95 respirators);

(iii) To find that Defendants' acts and conduct complained of herein render this case "exceptional;"

(iv) To award 3M – for donation to charitable COVID-19 relief efforts – treble damages in connection with Defendants' activities; and

(v) To award 3M – for donation to charitable COVID-19 relief efforts – its costs and reasonable attorneys' fees incurred in this matter, with and pre-judgment and post-judgment interest.

119.    Pursuant to 15 U.S.C. § 1118, to order the destruction of all unauthorized goods and materials within the possession, custody, and control of

Defendants that bear, feature, and/or contain any copy or colorable imitation of 3M's Marks and provide certification to the Court of same.

120.    For Claims 5 through 7, to issue an order permanently enjoining Defendants, their officers, agents, representatives, servants, employees, successors and assigns, and all others in active participation with them from engaging in conduct involving the advertisement or sale of 3M-brand products as described above, to award 3M restitution in the form of disgorgement of profits earned by Defendants in unlawfully selling 3M products, and to award Defendants their attorneys' fees, costs, and expenses pursuant to Cal. C.C.P. § 1021.5, with all such monetary relief to be donated to charitable COVID-19 relief efforts.

121.    For Claims 5 through 7, to order Defendants to file with the Court and serve upon 3M's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

122.    To award 3M such other relief that the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

123.    3M requests a trial by jury for all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

DATED this 28 day of January 2021.

BEVERIDGE & DIAMOND, P.C.

By: */s/ Kaitlyn D. Shannon*
Kaitlyn D. Shannon (SBN 296735)
456 Montgomery Street, Suite 1800
San Francisco, California 94104-1251
Phone: (415) 262-4000
kshannon@bdlaw.com

Bryan J. Moore (*pro hac vice*)
BEVERIDGE & DIAMOND, P.C.
400 West 15th Street, Suite 1410
Austin, Texas 78701-1648
Phone: (512) 391-8030
bmoore@bdlaw.com

*Attorneys for Plaintiff 3M Company*